IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARLOS RIVERA CUEVAS, et al. | |
| **Plaintiffs** | |
| v. | **CIVIL NO.** 16-2732 (RAM) |
| MUNICIPALITY OF NARANJITO, et al. | |
| **Defendants** | |

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, U.S. District Judge

Pending before the Court is Defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment*, accompanied by a *Statement of Uncontested Material Facts*. (Docket Nos. 75 and 77). For the reasons discussed below, having considered the parties' submissions both in opposition and support of the same, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' *Motion for Summary Judgment*. Accordingly, only Puerto Rico law claims remain. Given that all federal claims have been dismissed, Plaintiffs are **ORDERED** to show cause why the Court should not decline to exercise supplemental jurisdiction and dismiss the Puerto Rico law claims without prejudice.

## I.   PROCEDURAL BACKGROUND

On September 27, 2016, Plaintiffs Carlos Rivera-Cuevas, his wife Sullynett Ocaña-Morales, and their conjugal partnership, filed the present lawsuit alleging violations of the First, Fifth and Fourteenth Amendments under 42 U.S.C. § 1983 as well as violations of Puerto Rico law[1] against the Municipality of Naranjito and the Municipality's Mayor, Orlando Ortiz-Chevres; Police Commissioner, Pedro Fuentes-Morales; Police Sergeant, Eddie Cruz-Marcano; Human Resources Director, Solimar Hernández-Morales; and the Mayor's driver, Jesús Ramos-Rivera. (Docket No. 1). The individuals were sued in both their official and personal capacities, except for Jesús Ramos-Rivera, who was only sued in his personal capacity. Id. ¶¶ 5-9.

In response, the individual co-defendants in their **personal** capacity filed a *Motion to Dismiss for Failure to State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6)*. (Docket No. 19). On their part, the Municipality of Naranjito, joined by the individual co-defendants in their **official** capacity, filed a separate *Motion to Dismiss* under Fed. R. Civ. P. 12(b)(6). (Docket No. 21). Plaintiffs opposed both motions (Docket No. 28) and the co-defendants filed individual replies (Docket Nos. 36 and 37).

---

[1] Namely Sections 1, 4, 6 and 7 of Article II of the Constitution of Puerto Rico, P.R. Const. art. II, §§ 1, 4, 6-7; Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29 §§194 et. seq ("Law 115"); and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141, 5142.

On September 30, 2017, the Court issued an Opinion and Order granting in part and denying in part the motions to dismiss. (Docket No. 43). Accordingly, only the following causes of action remain before the Court: (1) Plaintiff Carlos Rivera-Cuevas's First Amendment claim under § 1983; (2) Plaintiffs' Law 115 claims against the Municipality of Naranjito and the individual co-defendants in their **official** capacity; (3) Plaintiffs' Article 1803 claims against the Municipality; and (4) Plaintiffs' 1802 claims. Id.

Following the Court's determination, Defendants filed their corresponding answers to the *Complaint*. (Docket Nos. 48, 49, and 62). Subsequently, on September 17, 2018, co-defendants the Municipality of Naranjito, Orlando Ortiz-Chevres, Eddie Cruz-Marcano, Solimar Hernández-Morales and Pedro Fuentes-Morales, in their official capacity, filed a *Memorandum of Law in Support of Defendants' Motion for Summary Judgment* and an accompanying *Statement of Uncontested Material Facts* the following day. (Docket Nos. 75 and 77).

Co-defendants Orlando Ortiz-Chevres, Eddie Cruz-Marcano, Solimar Hernández-Morales and Pedro Fuentes-Morales, in their official capacity, filed a *Motion for Joinder* seeking to join the *Motion for Summary Judgment* and Docket No. 77 and adding an argument regarding the qualified immunity doctrine. (Docket No.

78). Co-defendant Jesús Ramos-Rivera also filed a *Motion for Joinder*. (Docket No. 82).

On November 8, 2018, Plaintiffs filed their *Response in Opposition and Objections to Defendants Statement of Uncontested Facts and Submission of their own Statement of Genuine Disputed Material Facts* and *Response in Opposition to the Pending Motion for Summary Judgment and Motions to Join*. (Docket Nos. 91 and 92). Both motions for joinder were ultimately granted by the Court. (Docket No. 83 and 101).

The case at bar was transferred to the undersigned on June 13, 2019. (Docket No. 104).

## II. LEGAL STANDARD

A motion for summary judgment is governed by Fed. R. Civ. P. 56(a). Summary judgment is proper if the movant shows that (1) there is no genuine dispute as to any material fact and (2) they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008). A fact is considered material if it "may potentially 'affect the outcome of the suit under governing law.'" Albite v. Polytechnic Univ. of Puerto Rico, Inc., 5 F. Supp. 3d 191, 195 (D.P.R. 2014) (quoting Sands v. Ridefilm Corp., 212 F.3d 657, 660-661 (1st Cir. 2000)).

The moving party has "the initial burden of demonstrat[ing] the absence of a genuine issue of material fact with definite and competent evidence." Mercado-Reyes v. City of Angels, Inc., 320 F. Supp. 344, at 347 (D.P.R. 2018) (quotation omitted). The burden then shifts to the nonmovant, to present "competent evidence to rebut the motion." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at 6* (quoting Méndez-Laboy v. Abbott Lab., 424 F.3d 35, 37 (1st Cir. 2005)). A nonmoving party must show "that a trialworthy issue persists." Paul v. Murphy, 2020 WL 401129, at *3 (1st Cir. 2020) (quotation omitted).

While a court will draw all reasonable inferences in favor of the non-movant, it will disregard conclusory allegations, unsupported speculation and improbable inferences. See Johnson v. Duxbury, Massachusetts, 931 F.3d 102, 105 (1st Cir. 2019). Moreover, the existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Scott v. Harris, 550 U.S. 372, 379 (2007) (quotation omitted). Hence, a court should review the record in its entirety and **refrain from making credibility determinations or weighing the evidence**. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000).

In this District, summary judgment is also governed by Local Rule 56. See L. CV. R. 56(c). Per this Rule, an opposing party must "admit, deny or qualify the facts supporting the motion for

summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Id. Furthermore, unless the fact is admitted, the opposing party must support each denial or qualification with a record citation. Id.

Additionally, Local Rule 56(c) allows an opposing party to submit additional facts "in a separate section." L. CV. R. 56(c). Given that the plain language of Local Rule 56(c) specifically requires that any additional facts be stated in a separate section, parties are prohibited from incorporating numerous additional facts within their opposition. See Natal Pérez v. Oriental Bank & Trust, 291 F. Supp. 3d 215, 218-219 (D.P.R. 2018) (quoting Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) and Malave-Torres v. Cusido, 919 F.Supp. 2d 198, 207 (D.P.R. 2013)).

If a party opposing summary judgment fails to comply with the rigors that Local Rule 56(c) imposes, "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). Thus, litigants ignore this rule at their peril. See Natal Pérez, 291 F. Supp. 3d at 219 (citations omitted).

### III. FINDINGS OF FACT

To make findings of fact, the Court analyzed Defendants' Statement of Uncontested Material Facts in Support of their Summary Judgment Motion (Docket No. 77) and Plaintiffs' Response in

*Opposition and Objections to Defendants' Statement of Uncontested Facts and Submission of their Own statement of Genuine Disputed Material Facts* (Docket No. 91).

After **only crediting material facts** that are **properly supported by a record citation and uncontroverted**, the Court makes the following findings of fact:[2]

## A. The Naranjito Municipal Police Force

1.  Co-Defendant Orlando Ortiz-Chevres has been the Mayor of the Municipality of Naranjito ("Naranjito" or the "Municipality") since 2009 (henceforth "Mayor Ortiz"). (Docket No. 77 ¶ 1).

2.  Co-Defendant Solimar Hernández-Morales has been the Municipality's Human Resources Director since August 2012 (henceforth "HR Director Hernández"). (Docket Nos. 77 ¶ 2; 77-2 ¶¶ 2-3).

3.  Co-Defendant Pedro Fuentes-Morales was Naranjito's Municipal Police Commissioner from January 2013 until June 2018 (henceforth "Commissioner Fuentes"). (Docket No. 77 ¶ 3).

4.  Co-Defendant Eddie Cruz-Marcano became a Sergeant in 2009 and has served as the Interim Municipal Police Commissioner since June 2018 (henceforth "Sergeant Cruz"). Id. ¶ 4.

---

[2] References to a specific Finding of Fact shall be cited in the following manner: (Fact ¶ __).

5.   The organizational structure of the Naranjito Municipal
     Police Force consists of: (1) the Municipality's Mayor as
     the commander in chief; (2) followed by the Municipal
     Police Commissioner; (3) then the sergeants; and lastly
     (4) the municipal police officers ("MPO"). Id. ¶¶ 10, 124.

**B. Plaintiff Rivera's Employment**

6.   In 2011, Plaintiff Carlos Rivera-Cuevas ("Plaintiff" or
     "Rivera") applied for the position of Municipal Guard in
     the police force of the Municipality. (Docket Nos. 77 ¶ 5;
     89-1).

7.   MPO Pedro A. Fuentes-Ortiz, Badge 103, conducted an
     investigation regarding Plaintiff's application, which
     included interviewing Plaintiff's relatives and members of
     his community. (Docket No. 77 ¶¶ 6, 8).

8.   MPO Pedro A. Fuentes-Ortiz was assigned the investigation
     by the Municipal Police Commissioner at that time, Mr.
     Ramón Vázquez-Báez. (Docket Nos. 77 ¶ 7; 89-1).

9.   Ultimately, MPO Pedro A. Fuentes-Ortiz made a favorable
     recommendation as to Rivera's application. (Docket Nos. 77
     ¶ 8; 89-1).

10.  On May 1, 2013, Rivera was appointed to the position of
     MPO. (Docket No. 77 ¶ 9).

11.  Pursuant to the MPO Job Description, Plaintiff worked under
     the supervision of the Municipal Police Commissioner or

the person designated by the Commissioner. (Docket Nos. 77 ¶ 11; 89-3).

12. Accordingly, Plaintiff was assigned duties by his supervisors, namely: co-defendants Commissioner Fuentes and Sergeant Cruz. (Docket No. 77 ¶ 12).

13. During his employment at the Municipality, Plaintiff received awards for his work including an official recognition for his labor from Mayor Ortiz on September 14, 2015 and a pay raise effective July 1, 2016. (Docket Nos. 77 ¶¶ 40 and 42; 89-13).

14. According to Rivera's personnel file, he was not subject to any disciplinary or remedial actions during his employment at the Municipality. (Docket No. 77 ¶ 41).

15. Plaintiff was not disciplined, demoted, suspended or fired while he served as an MPO in Naranjito. Id. ¶ 43.

16. Rivera's salary was not withheld at any time during his employment. Id. ¶ 39.

17. On June 27, 2016, HR Director Hernández issued a certification stating that Plaintiff's personnel file "contains no evidence of reports, memos, administrative investigations or personnel actions against him." (Docket No. 89-12 at 1).

18. Plaintiff received a pay raise effective July 1, 2016. (Docket Nos. 77 ¶ 40; 89-13).

19. On October 27, 2016, HR Director Hernández issued a
    certification stating that in Plaintiff's personnel file
    "there is no evidence of administrative investigations
    against the same nor have any disciplinary actions been
    taken against said employee." (Docket No. 88-12 at 2).

## C. Rivera's Political Affiliation

20. Prior to being hired by the Municipality, Rivera attended
    New Progressive Party ("NPP") meetings where he saw co-
    defendants HR Director Hernández, Sergeant Cruz and
    Commissioner Fuentes. (Docket No. 91-1 at 280-281).

21. Rivera assumes that Mayor Ortiz, HR Director Hernandez,
    Sergeant Cruz and Commissioner Fuentes knew that he was an
    active member of the Popular Democratic Party ("PDP")
    because there were photos on Facebook of him participating
    in PDP campaign events. (Docket Nos. 77 ¶¶ 77-78; 91-1 at
    38-39).

22. Specifically, there exist photos of Rivera campaigning with
    PDP candidates Jordán Rodríguez, who was running for mayor
    of Naranjito, and Manuel Natal. (Docket No. 91-1 at 39-41,
    58).

23. Rivera also had photos with Anibal Acevedo Vilá and David
    Bernier, leaders of the PDP. (Docket No. 91-1 at 57-58).

24.   Plaintiff does not remember how many photographs he was
      in, how many were published, nor when the photographs were
      published. (Docket Nos. 77 ¶ 79; 91-1 at 40-41).

25.   Although Rivera does not remember being friends on Facebook
      with any of the co-defendants, his page was not private
      and thus accessible. (Docket Nos. 77 ¶ 80; 91 ¶ 249; 91-1
      at 57).

26.   No one told Plaintiff that Mayor Ortiz, HR Director
      Hernández, Commissioner Fuentes, or Sergeant Cruz were
      investigating him regarding being a member of the PDP.
      (Docket No. 77 ¶¶ 81-84).

27.   Plaintiff testified that politics were discussed at the
      workplace. (Docket Nos. 91 ¶ 278; 91-1 at 116-117).

28.   Rivera testified that he was not threatened nor approached
      in a violent matter regarding his political affiliation by
      Mayor Ortiz, HR Director Hernández, Commissioner Fuentes
      or Sergeant Cruz. (Docket Nos. 77 ¶ 115; 91-1 at 93-94).

**D. Rivera's Transfer Request to the Municipality of San Juan**

29.   On July 28, 2015, Plaintiff sent a letter to the Mayor of
      the Municipality of San Juan, Carmen Yulin-Cruz, expressing
      his interest in joining the San Juan Municipal Police
      force. (Docket No. 99-5).

30.   Plaintiff did not provide the Municipality with a copy of
      this letter expressing his interest in a transfer. (Docket
      No. 77 ¶ 45).

31.   Plaintiff does not know what process the Municipality of
      San Juan implemented after receiving his application. Id.
      ¶ 56.

32.   Plaintiff does not remember the year or the month when he
      talked to the Sergeant in charge of the investigation
      process in the Municipality of San Juan. Id. ¶ 67.

33.   There is no evidence of communications between the
      Municipality of San Juan and Naranjito regarding
      Plaintiff's transfer request. (Docket Nos. 77 ¶ 54; 89-6).

34.   Plaintiff does not know if the Municipality of San Juan
      sent a communication to Naranjito regarding his application
      nor has he seen any communication to that effect. (Docket
      No. 77 ¶¶ 55, 57, 58).

35.   Rivera did not attend or request any orientation by the
      Municipality's Human Resources Office regarding the
      transfer process or his transfer request. Id. ¶ 59.

36.   Instead, Plaintiff only consulted another MPO who had
      worked in Naranjito regarding the transfer process. Id. ¶
      60.

37.   Plaintiff does not know when Mayor Ortiz, HR Director
      Hernandez or Commissioner Fuentes learned that he was

interested in transferring to the Municipality of San Juan. Id. ¶¶ 74-76.

38. Plaintiff did not talk about his interest in transferring to the Municipality of San Juan with Mayor Ortiz nor with HR Director Hernández but did discuss his interest with Sergeant Cruz. (Docket Nos. 77 ¶¶ 61-62; 91-1 at 30).

39. Mayor Ortiz never received a formal request for a transfer from the Municipality of San Juan or from Plaintiff. (Docket No. 77 ¶ 46).

40. Plaintiff does not know whether Mayor Ortiz, HR Director Hernández, Sergeant Cruz nor Commissioner Fuentes made any negative comments about him during the Municipality of San Juan's investigation regarding Plaintiff's transfer request. Id. ¶¶ 63-66.

41. Plaintiff does not know if someone from the Municipality of San Juan interviewed Commissioner Fuentes, Sergeant Cruz, Mayor Ortiz, or HR Director Hernández regarding his transfer application. Id. ¶¶ 70-73.

42. Neither Commissioner Fuentes, Sergeant Cruz, Mayor Ortiz, nor HR Director Hernández are listed as having been interviewed on September 25, 2015 as part of the Municipality of San Juan's Hiring Process for Plaintiff. (Docket No. 99-3).

43. Mayor Ortiz did not take any action regarding Plaintiff's application to the Municipality of San Juan. (Docket Nos. 77 ¶ 47; 77-1 ¶ 16; 91-6 ¶ 3).

44. On November 25, 2015, Inspector Edwin Negron Pedroza of the Municipality of San Juan's Field Operations Bureau sent a letter to Police Commissioner Guillermo Calixto Rodriguez stating: "After analyzing and corroborating the captioned investigative file of Mr. Carlos X. Rivera Cuevas, candidate for transfer to the San Juan Municipal Police, we recommend that same [sic] may continue with the admission process as a transfer." (Docket Nos. 91 ¶ 376; 99-2).

45. Plaintiff does not know when the Municipality of San Juan's investigation regarding his transfer request ended. (Docket No. 77 ¶ 69).

46. Rivera did not hear back regarding his transfer request to the Municipality of San Juan. (Docket No. 91 at 294).

47. Plaintiff testified that he does not have any proof that Mayor Ortiz intervened with his request to transfer to the Municipality of San Juan. (Docket No. 77 ¶ 202).

**E. Other MPO Transfers**

48. MPO Michael Cotto-Ferrer ("MPO Cotto") worked in the Naranjito Municipal Police and requested a transfer to the Municipality of Guaynabo. (Docket Nos. 77 ¶ 85; 89-7).

49.  On January 15, 2016, the Municipality of Guaynabo sent a letter to the Municipality of Naranjito, via HR Director Hernández, informing them that they selected MPO Cotto for a transfer. (Docket Nos. 77 ¶ 89; 89-7 at 1).

50.  On February 1, 2016, Mayor Ortiz sent a letter in response authorizing the transfer effective March 1, 2016. (Docket Nos. 77 ¶ 89; 89-7 at 2).

51.  Plaintiff does not know when MPO Cotto presented his transfer request, when he was ultimately transferred, nor how much time transpired between the request and the transfer. (Docket No. 77 ¶¶ 86-88).

52.  Plaintiff is aware that MPO Frances Rivera was transferred to the Municipality of Caguas but does not know how much time transpired between her transfer request and the subsequent transfer. Id. ¶¶ 90-91.

53.  On September 1, 2015, the Municipality of Caguas sent a letter to Mayor Ortiz requesting MPO Frances Rivera's transfer. (Docket Nos. 77 ¶ 92; 89-8 at 1).

54.  On September 15, 2015, MPO Frances Rivera sent a letter to Mayor Ortiz and Commissioner Fuentes requesting the authorization of her transfer to the Municipality of Caguas. (Docket No. 89-8 at 2).

55.  On October 13, 2015, Mayor Ortiz responded to MPO Frances Rivera's letter informing her that her request for transfer

to the Municipality of Caguas had been approved and the transfer would be effective November 1, 2015. (Docket Nos. 77 ¶ 92; 89-8 at 3).

56. William Miranda Marin, a member of the PDP party, has been the Mayor of the Municipality of Caguas since 2010. (Docket No. 77 ¶ 93).

57. Plaintiff was aware that MPO Christian Vargas was transferred to the Municipality of Comerío. Id. ¶ 94.

58. José A. Santiago, a member of the PDP party, has been the mayor of the Municipality of Comerío since 2000. Id. ¶ 95.

**F. September 4, 2015 Autoexpresso Fine Incident**

59. On September 4, 2015 a meeting with other MPOs, Commissioner Fuentes stated in front of those present that Plaintiff had received an Autoexpresso administrative fine while on duty and that Plaintiff would have to pay for the fine out of his own pocket. (Docket Nos. 77 ¶ 136; 91-1 at 150-152; 99-4).

60. The fine had been caused by the police vehicle having insufficient funds in its corresponding Autoexpresso account. (Docket Nos. 91 ¶ 292; 99-4).

61. After the meeting, no one asked Plaintiff to pay the fine and no disciplinary or corrective actions were taken against Plaintiff. (Docket No. 77 ¶ 139).

62.  Mayor Ortiz was not aware of the fine or any incident related to Autoexpresso and Plaintiff. Id. ¶ 140.

**G. The November 6, 2015 incident with Jesús Ramos-Rivera**

63.  Co-defendant Jesús Ramos-Rivera ("Ramos") was Mayor Ortiz's driver. Id. ¶ 97.

64.  On November 6, 2015, Ramos confronted Rivera in the Naranjito public square while he was working and walking to his patrol car. Ramos called Plaintiff an expletive related to his political affiliation, specifically a "cabrón Popular," while putting his finger in Rivera's face. (Docket Nos. 91 ¶ 251; 91-1 at 61, 66-67; 99-6).

65.  Prior to this incident, Ramos had sent Plaintiff a message via WhatsApp asking why he was liking or commenting on certain PDP Facebook pages. (Docket Nos. 91 ¶ 248; 91-1 at 56-57 and 64).

66.  Plaintiff does not have any evidence that Ramos was acting on behalf of the NPP. (Docket Nos. 77 ¶ 114; 91-1 at 87-88).

67.  Plaintiff told Sergeant Cruz about the incident and that Ramos had disrespected him. Plaintiff did not tell Sergeant Cruz that Ramos had used vulgar words nor aggression. (Docket Nos. 77 ¶ 105; 77-4 ¶ 11).

68.  Plaintiff does not remember everything he told Sergeant
     Cruz about the incident. (Docket Nos. 77 ¶ 106; 91-1 at
     74-75).

69.  Sergeant Cruz told Plaintiff that, if he wanted to, he
     should file an incident report with the state police
     because Sergeant Cruz had a conflict of interest and could
     not investigate the incident. (Docket No. 77 ¶ 111).

70.  Plaintiff also approached Commissioner Fuentes to inform
     him that Ramos had assaulted him and that he was going to
     denounce him. Id. ¶ 101.

71.  Commissioner Fuentes told Plaintiff that the proper forum
     to do so was the state police. Id.

72.  Plaintiff filed a criminal complaint with the Puerto Rico
     Police Department ("PRPD") the same day of the incident,
     i.e. November 6, 2015. Id. ¶ 98.

73.  The Puerto Rico Police Incident report states that the
     offense Rivera allegedly committed was conduct against
     public morality. (Docket Nos. 91-14; 99-6)

74.  Plaintiff did not file a complaint against Ramos in the
     Municipality's Human Resources Office. (Docket No. 77 ¶
     109).

75.  Plaintiff did not give the Municipality a copy of the
     criminal complaint he filed with the PRPD against Ramos.
     Id. ¶ 112.

76.   Plaintiff does not know when Mayor Ortiz or HR Director
      Hernández became aware of the incident with Ramos. Id. ¶
      113.

77.   Ramos had previously applied for and received a special
      permit to carry weapons under Puerto Rico's firearms law.
      Id. ¶ 96.

78.   After the November 6th incident, Mayor Ortiz agreed with
      Commissioner Fuentes' recommendation to relieve Ramos of
      the possession of the firearm, since it belonged to the
      Municipality. Id. ¶ 99.

79.   Ramos was disarmed as part of the PRPD investigation. Id.
      ¶ 103.

80.   The Court of First Instance ordered the PRPD to seize
      Ramos' weapon. Id. 102.

81.   Because the weapon was Municipal property, the firearm was
      turned over to Commissioner Fuentes. Commissioner Fuentes
      put the weapon in a safe box, where it has remained. Id. ¶
      104.

82.   Ramos was not reissued a new firearm after the incident.
      Id. ¶ 100.

83.   Rivera testified that Commissioner Fuentes told him that
      the criminal complaint against Ramos affected the Mayor's
      image and there would be "a lot of consequences" if he did

not remove his police report against Ramos. (Docket No. 91-1 at 90, 136-138).

84. Plaintiff understood this to mean that he would lose his job or something bad would happen to him. Id. At 90.

85. Rivera continued the case against Ramos and did not receive any disciplinary nor corrective actions from Mayor Ortiz, Commissioner Fuentes or anyone else. (Docket Nos. 91-1 at 131-133; 77 ¶¶ 39, 41)

86. Ramos was found guilty of a misdemeanor (disturbing the peace) following Plaintiff's criminal complaint against him. (Docket No. 91 ¶¶ 268, 387).

## H. November 17, 2015 Incident Regarding Unnotified Absence

87. On November 17, 2015, Sergeant Cruz wrote a memorandum to Commissioner Fuentes informing him that Plaintiff did not show up for his scheduled duty on November 13, 2015, and did not notify his absence, in violation of Section 4, Subsection 4(v) of the Municipal Police Regulation. (Docket Nos. 77 ¶ 126; 89-9).

88. Sergeant Cruz had previously verified the service entry/exit book and found that Plaintiff had not shown for duty on November 13, 2015. (Docket No. 77 ¶ 128).

89. Upon further revision, it was confirmed that Plaintiff had been at the Bayamon district attorney's office that day in an official capacity for eight (8) hours, but had failed

to inform his superiors and MPOs on duty that he would be absent from his scheduled shift, creating a logistical problem for the police force. Id. ¶¶ 129-130.

90. A further investigation was not conducted, and no disciplinary action was taken against Plaintiff. Id. ¶ 131.

91. Article 9 of the Municipal Police Regulation controls the use and accumulation of compensatory time. Id. 133.

92. The main factor considered when authorizing compensatory time is the municipal police force's service needs. Id. ¶ 134.

93. Mayor Ortiz is not involved with the authorization of compensatory time to MPOs. Id. ¶ 135.

## I. Letters from HR Requesting Attendance Records

94. HR Director Hernández sent Plaintiffs three (3) letters dated April 8, 2014, November 10, 2014 and May 24, 2016, requesting that Plaintiff submit evidence of his attendance at the Police Academy for the period from March 2012 to September 2013. (Docket Nos. 77 ¶ 142; 89-11).

95. The letter dated April 8, 2014 informed Plaintiff that if the attendance records were not provided on or before May 15, 2014, "the bimonthly payment would not be made." (Docket No. 89-11 at 1).

96.  The letter dated November 10, 2014 informed Plaintiff that
     if he did not provide the missing attendance sheets by
     November 30, 2014 his "fortnight payment shall not be
     made." Id. At 3.

97.  Both the April 8, 2014 and the November 10, 2014 letters
     also requested that Rivera provide the birth certificate
     for his son to approve the paternity leave he claimed from
     June 26 through July 1, 2013. Id. At 1-3.

98.  The November 10, 2014 letter cautioned that if Rivera did
     not provide his son's birth certificate, the days requested
     for paternity leave would be deducted as regular vacation
     leave. Id. At 3.

99.  The May 24, 2016 letter was received on June 2, 2016 and
     required that Rivera provide the requested information by
     July 15, 2016. (Docket No. 77 ¶ 141).

100. Plaintiff was notified that his failure to provide the
     attendance sheets would result in his bimonthly payment
     being withheld. (Docket No. 89-11 at 4).

101. Neither Mayor Ortiz, Commissioner Fuentes nor Sergeant Cruz
     participated in the Human Resources letters requesting
     Rivera's police academy attendance records. (Docket Nos.
     77 ¶ 143; 77-1 ¶ 18).

## J. Incident with MPO John Redding

102. While on duty, Plaintiff had an incident with MPO John
     Redding ("MPO Redding"). In front of other officers, MPO
     Redding mentioned Plaintiff's previous incident with Jesús
     Ramos. Plaintiff testified that he asked MPO Redding to
     not discuss it and that MPO Redding told Plaintiff not to
     talk to him like that and stated he would do something
     violent against him. (Docket No. 91-1 at 224-225).

103. The state police investigated the incident and disarmed
     both Plaintiff and MPO Redding. (Docket No. 77 ¶ 149).

104. The Municipality investigated the incident with John
     Redding. (Docket No. 91 ¶ 388).

105. Commissioner Fuentes became aware of the incident through
     the state police. Further, he went to the state police
     station to collect the officers' firearms and store them
     in a safe box. (Docket No. 77 ¶¶ 154-155).

106. HR Director Hernández became aware of the incident when
     Plaintiff and MPO Redding visited her office and informed
     her. Id. ¶ 146.

107. Commissioner Fuentes filed a standard form requesting that
     both Plaintiff and MPO Redding be evaluated by a
     psychologist. Id. ¶ 151.

108. Upon the commissioner's request, both MPOs were referred
     to Mrs. Lisa Rosado, the person in charge of the

municipality's assistance program, for a psychological evaluation. (Docket Nos. 77 ¶¶ 150, 152; 77-2 ¶ 11).

109. The psychologist issued a positive report as to both officers and recommended that their firearms be returned. (Docket No. 77 ¶ 153).

110. Plaintiff and MPO Redding provided the report to Human Resources, which in turn informed Commissioner Fuentes of the results and recommendation therein. Id.

111. Upon the completion of the investigation and psychological evaluation, the firearms were returned to both MPOs. Id. ¶ 156.

## K. Miscellaneous Undated Workplace Incidents

112. The MPO Job Description requires police officers to conduct guard duty during the night and early in the morning. (Docket Nos. 77 ¶ 117; 89-3 at 1).

113. Shifts are assigned by sergeants and the Municipal Police Commissioner, not by the Human Resources Director. (Docket No. 77 ¶ 123).

114. Pursuant to an order from Commissioner Fuentes, Plaintiff was assigned to a special shift from 12:00 a.m. to 8:00 a.m. with another officer, MPO Leo Díaz. Plaintiff does not remember the days, months or years of this shift assignment nor why the shift was created. Id. ¶ 118.

115. In this special shift, Plaintiff conducted the same duties as in other shifts, specifically patrolling the streets. Id. ¶ 119.

116. Plaintiff requested that he be removed from the special shift. This request was granted, and Plaintiff returned to his regular shift of 4:00 p.m. to 12:00 a.m. Id. ¶ 120.

117. Plaintiff does not remember the days, months or years of this shift assignment nor why the shift was created. Id. ¶¶ 116, 118.

118. Plaintiff does not know if this shift continued after he was removed from it. Id. ¶ 122.

119. Plaintiff testified that only on one occasion Sergeant Cruz required Plaintiff to come to work or provide a medical certificate after sending a text message stating that he was sick. (Docket No. 77 ¶¶ 164, 166).

120. Plaintiff does not remember the date, month, or year when this happened. Id. ¶ 165.

121. Plaintiff went to work that day and stayed working although Sergeant Cruz subsequently told him to take the day off. Id. ¶ 167.

122. Plaintiff testified that he did not have knowledge if other MPOs were allowed to call in sick without submitting a medical certificate. Id. ¶¶ 168-169.

123. Plaintiff testified that he does not remember any other instance where he was sick and required to go to work or required to provide a medical certificate. Id. ¶¶ 170-171.

124. The Municipal Police Officer Job Description states that "[t]he work environment in which employees must act involves constant exposure to risks or fatal accident, thus requiring knowledge and due diligence in following detailed safety precautions, with continuous exposure in work areas." (Docket No. 77 ¶ 177; 89-3 at 1).

125. During the Christmas season of an unspecified year, State Police reported via the Police Department's radio that there was a group of heavily armed individuals and that they needed backup. Sergeant Cruz ordered Plaintiff to approach the area. (Docket No. 91-1 at 196-199).

126. Plaintiff testified that Sergeant Cruz instructed him to talk with State Police and to go with them in a patrol. Plaintiff was then joined by another police officer. (Docket Nos. 77 ¶ 174; 91-1 at 200-202).

127. Plaintiff does not remember if he went to the area where the there was a group of heavily armed individuals or whether the plan was called off. (Docket No. 91-1 at 203).

128. Plaintiff testified that after arresting an individual with an AK-47 weapon, he was going to obtain a warrant for his house and confiscate other weapons and needed more officers

to join him and Sergeant Cruz suggested he find other officers to go with him. Id. At 206-207.

129. Plaintiff testified that he was required to take weapons to the San Juan General Police Headquarters without a partner or backup. Plaintiff believes that he risked his life doing so because he "could've been intercepted by other thieves." (Docket Nos. 77 ¶ 176; 91-1 at 212-214).

130. Plaintiff testified that he did not remember an instance stated in the Complaint where he allegedly arrested a citizen and was left alone with the person in custody. (Docket Nos. 77 ¶ 178; 91-1 at 242).

131. Plaintiff never heard either Commissioner Fuentes or Sergeant Cruz instruct other officers not to assist him in his functions. (Docket No. 77 ¶¶ 179-180).

132. Plaintiff testified that approximately three (3) of the thirteen (13) police cars were new but he was not assigned to drive one of the new police cars. However, he would drive the new cars during his night shift if Sergeant Cruz and Commissioner Fuentes were not there. (Docket Nos. 77 ¶ 181, 91-1 at 218-220).

133. Plaintiff testified that Commissioner Fuentes and Sergeant Cruz would give him directions through third parties and that it was misleading. However, Plaintiff further

testified that other MPOs also received instructions through third parties. (Docket No. 77 ¶¶ 182-183).

134. Rivera testified that he was no longer assigned to be "Officer in Charge," *i.e.* shift supervisor, of other MPOs. (Docket No. 91-1 at 110).

135. The MPO job description, which applied to Plaintiff, does not include any supervisory functions. (Docket No. 77 ¶ 125).

136. The Naranjito Police Department gives an award each year to the officer with the most arrests. Plaintiff testified that he was not given the award but that he does not know how many arrests the winner, MPO Eduardo Colón, made nor how many arrests other fellow officers made. (Docket Nos. 91 ¶ 314; 91-1 at 249-252).

137. On an unspecified date, Plaintiff lost his keys, and did not remember where he placed them. Plaintiff testified that he believes MPO Leonardo Díaz took them, but he has no evidence. (Docket No. 77 ¶¶ 187-188, 190).

138. Neither Commissioner Fuentes nor Sergeant Cruz were present on the shift where Plaintiff lost his keys. Id. ¶ 189.

139. Plaintiff does not remember who found the keys. Id. ¶ 191.

140. Plaintiff testified that he does not have proof that anyone in the Municipality violated the confidentiality of his psychological evaluation. Id. ¶ 200.

141. Plaintiff testified that he does not have any proof that Mayor Ortiz delivered any instructions to other MPOs in the Municipality to alter the functions of his employment. Id. ¶ 201.

**L. Rivera's Resignation**

142. On January 25, 2017, Plaintiff sent a letter to Commissioner Fuentes informing his intention of resigning. Id. ¶ 13.

143. In his January 25, 2017 letter, Plaintiff stated that during his five years working in the municipality he learned a lot from all of his colleagues, but that he was searching for new work opportunities. (Docket Nos. 77 ¶ 14; 89-14).

144. On January 25, 2017, Plaintiff also sent a letter to Mayor Ortiz resigning from his position in the Municipality, effective February 1, 2017. (Docket No. 77 ¶ 15).

145. In his letter to Mayor Ortiz, Plaintiff stated:

> I have reached this decision in view of the fact that I found a better job offer for my professional career in criminal justice, a field in which I can grow and gain more experience. I am grateful for the opportunity given to me to work in the communities of our city of Naranjito.

(Docket Nos. 77 ¶ 16; 89-4).

146. Mayor Ortiz accepted Plaintiff's resignation in a letter dated January 30, 2017. (Docket Nos. 77 ¶ 17; 89-5).

147. Plaintiff applied to the Baltimore Police Department. (Docket No. 91 ¶ 319).

### IV. DISCUSSION

## 1. <u>Federal Law Claims</u>

### A. Section 1983 in General

Section 1983 does not create substantive rights. *See* 42 U.S.C.A. § 1983. Instead, it "is only a procedural vehicle to vindicate constitutional and other federal statutory violations brought about by state actors." <u>Pagan-Garcia v. Rodriguez</u>, 2015 WL 5084640, at *5 (D.P.R. 2015). To prevail in a Section 1983 claim, a plaintiff "must allege facts sufficient to support a determination (i) that the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States." <u>Cepero–Rivera v. Fagundo</u>, 414 F.3d 124, 129 (1st Cir. 2005) (internal quotations omitted). In this context, a state employee acts "under color of state law when, while performing in his official capacity or exercising his official responsibilities, he abuses the position given to him by the State." <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988).

Additionally, a § 1983 plaintiff is also "required to plausibly establish the link between **each particular defendant** and the alleged violation of federal rights." <u>Torres Lopez v. Garcia-Padilla</u>, 209 F. Supp. 3d 448, 454–55 (D.P.R. 2016) (citation

omitted) (emphasis added). This can be achieved by showing any "personal action or inaction [by defendants] within the scope of [their] responsibilities that would make [them] personally answerable in damages under Section 1983." Id. (quotation omitted). "[W]hile plaintiffs are not held to higher pleading standards in § 1983 actions, they must plead enough for a necessary inference to be reasonably drawn." Montañez v. State Ins. Fund, 91 F. Supp. 3d 291, 297 (D.P.R. 2015) (quotation omitted).

**B. Political Discrimination under the First Amendment**

The First Amendment protects the rights of individuals to freely associate with others "for the common advancement of political beliefs and ideas." Ramirez-Nieves v. Municipality of Canovanas, 2017 WL 1034689, at *7 (D.P.R. 2017) (quotation omitted). As a corollary to this protection, the First Amendment prohibits government officials from "taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of employment." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 13 (1st Cir. 2011) (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 (1990). See also Medina-Velazquez v. Hernandez-Gregorat, 2015 WL 6829150, *3 (D.P.R. 2015) ("The First Amendment protects non-policymaking public employees from adverse employment action due to political affiliation.").

A *prima facie* political discrimination claim under the First Amendment requires evincing four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Reyes-Orta v. Puerto Rico Highway & Transp. Auth., 811 F.3d 67, 73 (1st Cir. 2016) (quoting Ocasio-Hernandez, 640 F.3d at 13)). To establish that political affiliation was a substantial or motiving factor, the "plaintiff must make **a fact-specific showing** that a causal connection exists between the adverse treatment and the plaintiff's political affiliation." Aviles-Martinez v. Monroig, 963 F.2d 2, 5 (1st Cir. 1992). In other words, "[t]he plaintiff must point 'to evidence on the record which, if credited, would permit a rational fact finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus.'" Gonzalez-De-Blasini v. Family Dep't, 377 F.3d 81, 85 (1st Cir. 2004) (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996).

If the plaintiff successfully shows all four prongs of the *prima facie* case, the burden "shifts to the defendant to articulate a non-discriminatory ground for the adverse employment action and to establish, by a preponderance of the evidence, that the same action would have been taken regardless of the plaintiff's

political beliefs." <u>Medina-Velazquez</u>, 2015 WL 6829150, at *3 (citing <u>Mt. Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)). If defendants make this showing, the plaintiff may counter defendant's proffered non-discriminatory motivation by providing evidence to show that "discrimination was more likely than not a motivating factor." <u>Id.</u> (citing <u>Padilla-García v. Rodríguez</u>, 212 F.3d 69, 77 (1st Cir. 2000)).

### C. Plaintiff has not established a *prima facie* case of political discrimination

Defendants do not contest that that the first element of the *prima facie* case, distinct political affiliations between plaintiffs and defendants, is met. Rivera testified regarding his own political affiliation and that he learned of co-defendants HR Director Hernández, Commissioner Fuentes, and Sergeant Cruz's political affiliation by seeing them at NPP meetings on various occasions. (Fact ¶ 20). The Court can also take judicial notice that Mayor Ortiz is an elected official of the NPP.[3] *See* Fed. R. Evid. 201(b)(2).

Co-defendants Mayor Ortiz, HR Director Hernández, Commissioner Fuentes, and Sergeant Cruz maintain that they were not aware of Rivera's PDP affiliation. (Docket No. 77 ¶¶ 18-38).

---

[3] *See* Puerto Rico State Commission on Elections, 2008 General Election Results, *Mayor Results by Municipality*, http://209.68.12.238/elecciones2008/CEE_Events/ ELECCIONES_GENERALES_2008_4/ESCRUTINIO_GENERAL_8/default.html (last updated on June 15, 2009). As stated above, Mayor Ortiz has served as the mayor Naranjito since 2009. (Fact ¶ 1).

To controvert this fact, Rivera testified that these co-defendants would have known his political affiliation because he was an active member of the PDP and there were photos of him participating in various PDP campaign events. (Facts ¶¶ 21-23). "Generally, conclusory allegations that one's political association is well-known will not meet a plaintiff's burden of showing that a defendant had knowledge of [their] political affiliation." Avilés v. Figueroa, 195 F. Supp. 3d 435, 445 (D.P.R. 2016). *See also* Gonzalez-De-Blasini, 377 F.3d at 85. However, following the November 6, 2015 incident where Ramos publicly made disparaging remarks towards Plaintiff for being a member of the PDP, there is sufficient circumstantial evidence that co-defendants Mayor Ortiz, HR Director Hernández, Commissioner Fuentes and Sergeant Cruz would have been made aware of Rivera's actual or perceived PDP affiliation. (Facts ¶¶ 64-86). *See* Welch v. Ciampa, 542 F.3d 927 (1st Cir. 2008) (holding that discrimination based on a perceived affiliation instead of an actual affiliation may suffice for a First Amendment violation).

Rivera voluntarily resigned from his position in the Municipality. (Facts ¶¶ 142-146). Thus, in the absence of termination, Rivera "must meet the severity of the harm test enunciated by the First Circuit in Agosto-de-Feliciano v. Aponte-Roque." Rosado De Velez v. Zayas, 328 F.Supp. 2d 202, 208 (D.P.R. 2004). Adverse employment actions in political discrimination

cases need not constitute a "constructive discharge" nor be "tantamount to dismissal." Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc). Instead, a plaintiff can meet their burden by showing "clear and convincing evidence" that "the employer's challenged actions result in a work situation 'unreasonably inferior' to the norm for the position." Id. at 1218, 1220. Said differently, "an employee must show a permanent, or at least sustained, worsening of conditions to reach the threshold of constitutional injury." Id. at 1219. Then, the plaintiff must "prov[e] by a preponderance of the evidence that [their] political affiliation was a substantial or motivating factor behind the personnel actions at issue." Cardona Martinez v. Rodriguez Quinones, 306 F.Supp.2d 89, 94 (D.P.R. 2004), aff'd, (1st Cir. 2006).

In the case at bar, Rivera testified regarding a wide range of instances that purportedly constitute an unreasonably inferior work environment and thus, political discrimination. First, and most importantly, Plaintiff alleges that he was denied a transfer to the Municipality of San Juan because of his political beliefs. The Supreme Court has determined that "promotions [and] transfers, […] based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." Rutan v. Republican Party of Illinois, 497 U.S. 62, 75 (1990). Being denied a transfer for political reasons, would thus be

equally sanctionable. However, Plaintiff **has failed to establish
that any of the co-defendants were responsible for his requested
transfer not being authorized**. Plaintiff admitted that he did not
know what process the Municipality of San Juan implemented to
handle his application. (Fact ¶ 31). He further testified that he
does not have any proof that Mayor Ortiz intervened with his
transfer request. (Fact ¶ 47). The record shows that other
municipalities would send a formal letter to Naranjito requesting
authorization of the transfer. (Facts ¶¶ 49; 53). In Rivera's case,
there is **no evidence of communications between the Municipality of
San Juan and the Municipality of Naranjito regarding Plaintiff's
transfer request**, let alone a letter from the Municipality of San
Juan requesting approval of a transfer. (Fact ¶ 33).

Even assuming *arguendo* that the denial of Plaintiff's
transfer request was attributable to Mayor Ortiz or any other co-
defendant, Plaintiff has not established that it was denied on
account of Plaintiff's political affiliation. Rivera alleges in
his *Opposition* that Defendants saw his request for a transfer to
the Municipality of San Juan, whose mayor was a member of the PDP
at the time, as a betrayal and that people were mad at him for
requesting said transfer. (Docket No. 92 at 6; 91-1 at 129-130).
Yet, he sustains these claims with information he did not perceive
directly. Instead, he cites third parties who informed him about
other co-worker's alleged anger towards him. Id. At the summary

judgment stage, this constitutes inadmissible hearsay as to the truth of the matter asserted. *See* L. CV. R. 56(e), *see also* Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 12 (1st Cir. 2016). Moreover, Defendants presented evidence of various instances in which other municipal police officers were authorized transfers to Municipalities with PDP mayors. (Facts ¶¶ 55-58).

While Jesús Ramos' disparaging comments regarding Plaintiff's PDP affiliation were politically motivated, even this dramatic incident does not rise to the level of political discrimination necessary to sustain a *prima facie* political discrimination claim. Ramos was not one of Rivera's supervisors and "[a] single insult by a co-worker with no supervisory power is not political discrimination by one exercising official authority." Rosario-Urdaz v. Velazco 433 F.3d 174, 179 (1st Cir. 2006). The First Circuit has explained that unless co-workers "carried on a substantial campaign of harassment, instigated or knowingly tolerated by superiors, their acts would not constitute the mis-exercise of government power at which section 1983 is aimed." Id. (citations omitted). Plaintiff failed to show that any of the Defendants tolerated this behavior. Instead, the Municipality proved how it *did not* tolerate such behavior when it came to a subsequent incident where MPO John Redding brought up Rivera's complaint against Ramos and became aggressive. (Fact ¶ 102). The

State Police conducted an investigation which entailed disarming Redding and Rivera. (Fact ¶ 103). Furthermore, Commissioner Fuentes requested that both Redding and Rivera be evaluated by a psychologist. (Facts ¶¶ 107-108). Human resources evaluated the psychologist's report and recommendation. Only upon completion of the investigation and psychological evaluation were the firearms returned to the MPOs. (Facts ¶¶ 109-111). Therefore, despite Rivera's isolated incidents with co-workers, Plaintiff failed to show that the Municipality allowed them to carry out a campaign of harassment against Plaintiff.

As another example of alleged political discrimination, Plaintiff states that on September 4, 2015, Commissioner Fuentes, in the presence of other officers, stated that Rivera would be required to pay an Autoexpresso fine. (Fact ¶ 59). Yet, Plaintiff did not successfully establish whether Commissioner Fuentes was aware of his political affiliation at the time of this encounter. Moreover, Rivera was never required to pay the fine. (Facts ¶¶ 61-62).

It is uncontested that on November 17, 2015, Sergeant Cruz informed Commissioner Fuentes that Plaintiff had an unnotified absence. (Fact ¶ 87). No disciplinary action was taken once further revision demonstrated that Rivera had merely failed to inform his supervisors that he would be absent from his scheduled shift to attend the Bayamon district attorney's office. (Fact ¶¶ 89-90).

Ensuring that employees are present for assigned shifts or otherwise notify their absences through the appropriate channels cannot be considered an adverse employment action. *See* <u>Moore v. Def. Logistics Agency</u>, 670 F. Supp. 800, 804 (N.D. Ill. 1987) ("An agency is entitled to make rules and regulations in order to facilitate its efficient operation, and to have its employees respect such rules and regulations in order to achieve that end.").

Rivera further posits that the Municipality's Human Resources Department discriminated against him when it issued a letter in May 2016 asking Rivera to submit his Police Academy attendance records and notifying that failure to comply would keep him from receiving his bimonthly paycheck. (Facts ¶¶ 94, 99-100). But Plaintiff had previously received two letters in 2014 requesting the exact same information and containing the same penalty for lack of compliance. (Facts ¶¶ 94-98). Importantly, Rivera's paycheck was not withheld. (Fact ¶ 16).

In addition to these aforementioned instances, Rivera details various workplace occurrences, assignments or general grievances to support his discrimination claim but **fails to specify when they transpired**. This is crucial, because it makes it impossible to know whether any of the co-defendants were **actually aware of Rivera's political affiliation at the time of these incidents**.

Rivera testified that for an unspecified time, pursuant to Commissioner Fuentes orders, Rivera was assigned to a special shift

where he conducted the same duties from 12:00 a.m. to 8:00 a.m. with another officer. (Fact ¶ 114-116). Although being assigned an unfavorable work schedule can be considered an adverse employment action, Plaintiff was notably not the only officer assigned to the special shift and once Plaintiff requested to be removed from the same, his request was granted. (Fact ¶ 114). *See* Juarbe-Velez v. Soto-Santiago, 558 F.Supp.2d 187, 202 n. 5 (D.P.R. 2008) (holding that initially receiving a problematic work schedule that was later remedied, albeit a minimal adverse employment action, "would not rise to the level of creating an unreasonably inferior work environment" for an officer of the Puerto Rico Emergency Management Office).

On another occasion, Rivera was required to attend work, despite informing Sergeant Cruz that he was sick via text message, because he did not provide a medical certificate. (Fact ¶ 119). Plaintiff subsequently admitted that he was unaware whether other MPOs had been authorized to take a sick day without submitting a medical certificate. (Fact ¶ 122). A policy requiring medical certificates as a requirement to approve medical leave is not an adverse action. Nor is an isolated denial of leave. *See* Amaro Amaro v. Caribbean Restaurants LLC, 2008 WL 11502469, *8 (D.P.R. 2008) (finding that the denial of an employee's "specific medical leave request does not rise to the level of materially adverse employment action.").

Rivera asserts that he was placed in two dangerous situations while on duty. First, Sergeant Cruz ordered Plaintiff to approach an area where a group of heavily armed individuals were located and assist the State Police. (Fact ¶ 125). Rivera was not required to go alone, as he was joined by another police officer, and ultimately could not remember if he went to the area or if the plan was called off. (Facts ¶¶ 126-127). Second, Rivera was once tasked with transporting weapons to the San Juan General Police Headquarters without a partner. (Fact ¶ 198). The MPO Job Description delineates that a police officer's work environment "involves constant exposure to risks." (Fact ¶ 124). While both instances represented a certain degree of risk to Plaintiff, Rivera did not allege that the requests were unusual for a municipal police officer nor that he was the only officer directed to complete such dangerous tasks.

Although he did not provide a date, Rivera also testified that he was no longer assigned to be "Officer in Charge" or the shift supervisor of other MPOs. (Fact ¶ 134). In Agosto-de-Feliciano, the First Circuit advised that the loss of supervisory status can amount to an adverse employment action depending on "whether the supervisory role had been a primary part of the job, whether the duties [plaintiff] retained were challenging and significant, and whether new and inferior working conditions accompanied the change in duties." Agosto-de-Feliciano, 889 F.2d

at 1219. Here, Rivera did not have a supervisory role within the hierarchy of the Naranjito Municipal Police Force and any supervisory functions he performed were not a part of his formal MPO job description. (Fact ¶¶ 5, 135).

In more general terms, Rivera testified that he was not assigned one of the new police cars, although approximately only three out of the thirteen available cars were new, and thus other police officers also used the older vehicles. (Fact ¶ 132). Similarly, although Rivera also complained that he was given instructions from Commissioner Fuentes and Sergeant Cruz through third parties, allegedly to confuse him, Plaintiff also admitted that other MPOs would receive their instructions in the same fashion. (Fact ¶ 133).

After "canvass[ing] the specific ways" Plaintiff's job allegedly changed, the Court finds that Rivera "retained duties, perquisites and a working environment appropriate for his […] rank and title." Agosto-de-Feliciano, 889 F.2d at 1209. Rivera's duties, pursuant to his job description, never changed. Having to comply with rules regarding notifying absences and requesting sick leave cannot reasonably be equated with an adverse employment action, let alone discrimination. Similarly, being required to respond to dangerous situations is not unusual for a police officer. The Municipality did not allow Plaintiff to be harassed by co-workers and Rivera failed to evince that he was harassed by

any superiors for his political beliefs. Thus, even in the aggregate, Rivera has not provided clear and convincing evidence that he was subjected to unreasonably inferior working conditions. Rivera has therefore not been able to establish the third element of a *prima facie* political discrimination case.

### D. Retaliation for Seeking Redress in Court

The First Amendment protects the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. This protection also encompasses "the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). "Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004). To prevail on such a claim, a plaintiff must show that their "conduct was constitutionally protected, and that this conduct was a 'substantial factor' or ... a 'motivating factor' for the defendant's retaliatory decision[]" or adverse employment action. Id. at 17. (quoting Mt. Healthy, 429 U.S. at 287).

"For purposes of a First Amendment retaliation claim, even in an employment setting, a plaintiff need not suffer an 'adverse employment action' as that term ordinarily is used in the employment discrimination context." Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011). Instead, "the pertinent question in a § 1983 retaliation case based on the First Amendment is whether the

defendant's actions would deter 'a reasonably hardy individual[ ]' from exercising his constitutional rights[,]" thereby causing a chilling effect. Id. (quoting Agosto-de-Feliciano, 889 F.2d at 1217). In this context, "relatively minor events can give rise to § 1983 liability, **so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights**." Id. (internal quotations and citations omitted) (emphasis added).

Even by this lesser standard, Rivera has not shown that he was retaliated against for filing a complaint and participating in the trial against Ramos.[4] It is uncontested that Rivera exercised his First Amendment Right when he submitted his complaint against Jesús Ramos with the State Police. (Fact ¶ 72). Nevertheless, as discussed at length above, Rivera has failed to establish that he suffered any adverse employment actions. Although temporal proximity is not the only relevant factor, many of the instances Plaintiff raised, including that of the special shift assignment (Fact ¶ 114), lack even an estimated date. This makes it impossible to know if they occurred in response of Rivera's complaint. See e.g. Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 25 (1st Cir. 2014) (explaining that "'temporal proximity' is merely

---

[4] The Court notes that Defendants did not directly address this claim in their Motion for Summary Judgment. (Docket No. 75). They did, however, discuss retaliation within the context of Law 115. Plaintiffs on their part, reaffirmed that the elements of a First Amendment retaliation claim were present.

one factor relevant to causation and usually only later in the proceedings, for example at summary judgment."). Furthermore, the incident involving the Autoexpresso fine certainly happened *prior* to Rivera's complaint against Ramos. (Fact ¶ 59). Moreover, not being able to always drive one of the few new cars does not amount to harassment nor the removal of privileges. Nor does it amount to an adverse employment action. Lastly, Rivera did not show that his duties as an MPO were altered nor that he was unduly requested to perform dangerous tasks. Once again, the Court notes that the Municipality did not tolerate MPO Redding's aggression towards Plaintiff and did not allow there to be a campaign of harassment towards Rivera. (Facts ¶¶ 102-111).

Rivera was equally unable to show that his complaint against Ramos was a substantial or motivating factor in his transfer to the Municipality of San Juan not being approved. Rivera did not provide insight as to the process that the Municipality of San Juan uses to approve transfers. Moreover, there is no evidence on the record that the Municipality of San Juan requested Rivera's transfer and that the same was not approved out of retaliation.

In his deposition, Rivera did testify that Commissioner Fuentes told him that there would be consequences if he did not remove his complaint. (Fact ¶ 83). However, Plaintiff has not shown that these consequences materialized. Even in § 1983 claims, "[t]hreats of retaliation **standing alone** do not generally

constitute adverse employment actions." Rivers v. New York City Hous. Auth., 176 F. Supp. 3d 229, 251 (E.D.N.Y. 2016), aff'd sub nom. Crenshaw v. New York City Hous. Auth., 697 F. App'x 726 (2d Cir. 2017) (emphasis added); see also Sensabaugh v. Halliburton, 937 F.3d 621, 629 n. 2 (6th Cir. 2019), cert. denied, 140 S. Ct. 1116, 206 L. Ed. 2d 184 (2020) ("threats alone are generally not adverse actions for retaliation purposes"); Bollinger v. Thawley, 304 F. App'x 612, 614 (9th Cir. 2008) (quoting Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998)) ("Mere harsh words or threats are insufficient to constitute an actionable adverse employment action."); Akins v. Fulton Cty., Ga., 420 F.3d 1293, 1301 (11th Cir. 2005) (concluding that Plaintiffs did not establish that they suffered an adverse employment action because they did not allege "that the reprimands or the threats of suspension and job loss affected the terms and conditions of their employment or their status as employees."); Kubala v. Smith, No. 20-3085, 2021 WL 56149 (6th Cir. Jan. 7, 2021) (finding that while direct, repeated threats can constitute an adverse employment action, a singular, ambiguous threat, via a proxy, cannot).

In light of the above, Rivera has **not met** his burden of showing that he suffered a retaliatory decision or adverse

employment action that would have led to a chilling effect of his

First Amendment Rights.[5]

## 2. Supplemental Jurisdiction over Puerto Rico Law Claims

In accordance with the above, all federal law claims have

been dismissed. However, dismissal of the federal retaliation

claim does not dispose of this matter because the plain text of

Law 115, also known as Puerto Rico's Whistleblower Act, provides

that:

> **No employer may** discharge, **threaten**, or
> discriminate against **an employee** regarding the
> terms, conditions, compensation, location,
> benefits or privileges of the employment
> **should the employee offer or attempt to offer,**
> **verbally or in writing, any testimony,**
> **expression or information before a**
> **legislative, administrative or judicial forum**
> **in Puerto Rico**, when such expressions are not
> of a defamatory character nor constitute
> disclosure of privileged information
> established by law.

P.R. Laws Ann. tit. 29 § 194a(a) (emphasis added). Law 115 also

creates a cause of action for employees affected by a violation of

the cited provision. Id. § 194a(b). Moreover, the Whistleblower

---

[5] At Docket No. 78, co-defendants Orlando Ortiz-Chevres, Eddie Cruz-Marcano,
Solimar Hernández-Morales and Pedro Fuentes-Morales, in their official
capacities, raised an argument regarding the qualified immunity doctrine. "The
doctrine of qualified immunity protects a state official from liability for
damages under § 1983 where [their] conduct did 'not violate clearly established
statutory or constitutional rights of which a reasonable person would have
known.'" Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 9 (1st Cir. 2013)
(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Because Rivera has
failed to establish a genuine issue of material fact as to whether said co-
defendants violated any of his constitutional rights under § 1983, the Court
"need not reach the issue of qualified immunity." Gonzalez-De-Blasini, 377
F.3d at 88 n. 4.

Act provides that an employee can "establish a prima facie case of violation of the act by proving that he/she **participated in an activity protected by §§ 194 et seq. of this title and that he/she was subsequently** discharged, **threatened** or discriminated against regarding his/her employment." Id. § 194a(c) (emphasis added).[6]

The First Circuit has held that "when all federal claims have been dismissed, it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve the interests of fairness, judicial economy, convenience, and comity." Zell v. Ricci, 957 F.3d 1, 15 (1st Cir. 2020) (quoting Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017)) (internal quotations omitted). However, in the case at bar, there *may* be factors in favor of retaining jurisdiction. Thus, Plaintiffs are **ORDERED** to show cause why the Court should not decline to exercise supplemental jurisdiction and dismiss the Puerto Rico law claims without prejudice.

## V. CONCLUSION

For reasons set forth above, the Court **GRANTS** in part and **DENIES** in part Defendants' *Motion for Summary Judgment*, as joined by all named co-defendants. (Docket Nos. 75, 77, 78, 82). The Court hereby dismisses with prejudice all of Plaintiff Carlos Rivera-Cuevas First Amendment claims under § 1983. Within the next **THIRTY**

---

[6] Similarly, Sullynett Ocaña-Morales' derivative Article 1802 cause of action for damages caused by the alleged Law 115 violation cannot be dismissed at this juncture.

**(30) DAYS**, Plaintiffs **SHALL** show cause why the Court should not decline to exercise supplemental jurisdiction and dismiss the Puerto Rico law claims without prejudice.

        **IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of February 2021.

                              S/ RAÚL M. ARIAS-MARXUACH_____
                              United States District Judge